**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                                         :
JULENE P. CHRISTIE,                             :
                                Plaintiff,          :          Civil Action No. 09-6400 (FLW)
                                                    :
                  v.                                :
                                                    :                    **OPINION**
MICHAEL J. ASTRUE,                           :
COMMISSIONER OF SOCIAL              :
SECURITY,                                          :
                                                    :
                                Defendant.         :
_____ :

**WOLFSON, United States District Judge:**

Julene P. Christie ("Plaintiff") appeals the final decision of the Commissioner of Social

Security ("Commissioner") denying Plaintiff disability benefits under the Social Security Act

("Act"). The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). Plaintiff

contends that the record, when considered in full, substantiates her claims and requires a

conclusion that she is entitled to disability insurance benefits under sections 216(I) and 223 of the

Act. Specifically, Plaintiff maintains that the Administrative Law Judge (the "ALJ") erred in

determining that Plaintiff was not disabled as of her alleged onset date of December 31, 1989.

After reviewing the administrative record, this Court finds that the ALJ's decision is based on the

substantial evidentiary support required by 42 U.S.C. § 405(g) and, therefore, the ALJ's decision

is affirmed in its entirety.

1

## I.    OVERVIEW

### A.  Procedural History

Plaintiff first filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits on July 29, 1985, claiming onset as early as December 2, 1984 due to diabetes and arthritis. Tr. 737. These applications were denied initially and on reconsideration. Id. Plaintiff did not request a hearing before an ALJ. Id.

Plaintiff filed her second application (for DIB only) on November 1, 1990 with an onset date of December 20, 1989, due to arthritis. Id. This application was denied initially and on reconsideration.  After a hearing, the ALJ vacated the decision to enable the state agency to fully adjudicate Plaintiff's mental disorder. Id. On remand, however, Plaintiff's claim was again denied and no appeal was filed.

Plaintiff filed a third application for DIB on September 10, 1993, alleging that she had become disabled on August 9, 1993, due to arthritis. Tr. 737.  This claim was also denied initially and on reconsideration. Id.

 Plaintiff filed a fourth application for disability insurance benefits on December 22, 1994, alleging that she had become disabled on December 20, 1989. Tr. 460-63.  The claim was denied initially and on reconsideration. Id.

Plaintiff filed another application for DIB on April 30, 1995, alleging disability since December 20, 1989, due to asthma, heart problems, arthritis, reading problems, emotional problems and obesity. R. 738.  On July 18, 1995, Plaintiff's application was denied. Plaintiff filed a request for reconsideration on September 14, 1995 which was denied on October 19, 1995.  Thereafter,  Plaintiff filed a request for a hearing before an ALJ. The ALJ dismissed

Plaintiff's claim on February 25, 1998, after finding that a previous application for benefits barred the 1995 claim on *res judicata* grounds.  Plaintiff appealed the decision to the Appeals Council on March 9, 1998.  The Appeals Council vacated the ALJ's dismissal and remanded the claim to the ALJ finding that the introduction of new and material evidence rendered the doctrine of *res judicata* inapplicable. Id.   A new hearing was held on January 15, 2002, and, in a decision dated February 15, 2002, the ALJ found that Plaintiff was not disabled. Id, Plaintiff requested a review and, on March 13, 2003, the Appeals Council denied Plaintiff's request, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. Tr. 752.

Subsequently, Plaintiff appealed to the United States District Court for the District of New Jersey.  On September 6, 2006, the Honorable Stanley R. Chesler issued a decision remanding the matter.[1]  Id.  However, Plaintiff appealed Judge Chesler's decision to the Third Circuit.  On February 28, 2006, the Third Circuit remanded the case finding that because of the unusual circumstances of this case, the obesity listing that was in effect when the claim was first adjudicated in 1998 should be applied. Id.

Plaintiff appeared at a hearing in front of an ALJ, Paula Gerrety, on February 10, 2009, alleging disability as of December 20, 1989.  In addition, Robert B. Sklaroff, MD, an impartial medical expert ("ME"), and Dr. Carolyn E. Rutherford, an impartial vocational expert ("VE"), testified at the hearing.  Id.   On April 22, 2009, the ALJ issued a decision finding that: (1)

---

[1] In his decision, Judge Chesler held that: (1) the ALJ did not err in applying the then new obesity guidelines, but did err by not discussing whether Plaintiff's obesity equaled the severity requirement of any other listing; (2) the ALJ did not err when he determined that the claimant could return to her past relevant work as a cashier as performed in the general economy; (3) the ALJ gave sufficient reasons for not crediting the Plaintiff's testimony and subjective allegations regarding her inability to do work; (4) there was no error in failing to obtain vocational testimony at step 5 because the Plaintiff did not meet her burden of proof to demonstrate that she could not return to her past relevant work at step 4; and (5) the Plaintiff's borderline intellectual functioning did not meet listing-level severity. Tr. 752

Plaintiff was not disabled within the meaning of any listing which DIB covers; and (2) Plaintiff

retained the residual function capacity to perform a range of light work. Tr. 749-763.

Subsequently, on December 18, 2009, Plaintiff filed the instant action seeking review of

the Commissioner's denial of disability benefits.  Specifically, in her brief, Plaintiff argues that:

(1)  the ALJ erred when she found that Plaintiff did not meet the former listing for obesity–

9.09A; (2) the ALJ erred by rejecting the opinion of Dr. Weiss who found that Plaintiff had an IQ

below 70; (3) the ALJ failed to address the report of Dr. Zimmerman or the testimony of the

vocational experts; and (4) that the ALJ failed to make a finding regarding Plaintiff's credibility.

B. Background

Plaintiff was born on October 24, 1947.  Tr. 48. Plaintiff has an eighth grade education

and was placed in special education classes for math and reading.  Tr. 51. Before Plaintiff

stopped working, she was employed as a cashier, stock person and a bus driver. Tr. 53,54, 62.

Plaintiff testified that she had been fired from cashier jobs a number of times because of her

inability to add, subtract, and generally keep proper account of the money.  Tr. 52, 54, 56, 57 61.

At a 2002 hearing, Plaintiff testified that she worked as a cashier at a truck stop for 16-18 months

but quit after her boss accused her of stealing. Tr. 57.  Plaintiff stopped working in 1989 and

claims that she is, and has been, unable to maintain employment due to a combination of obesity,

arthritis, and diminished mental capacity.  Pl's Br. at 5.

C. Plaintiff's Physical Impairments

As of her date last insured, hospital records indicate that Plaintiff, who is 5' 2'' tall,

weighed between 300 and 320 lbs. Tr. 368-69.  Plaintiff was admitted to the emergency room on

several occasions in 1984 and 1985 where she was diagnosed with various ailments, including

4

acute gastritis (Tr. 335), peptic ulcer disease ("PUD") (Tr. 336) and migraine headaches. Tr. 342, 348.

Dr. Stephen Ocken conducted a consultative examination of Plaintiff on August 22, 1985. Tr. 154-55.  At that time, Plaintiff was 5'3'' tall and weighed 253 pounds. Tr. 155.  According to Dr. Ocken,  x-rays performed on Plaintiff showed that "[t]he lumbosacral spine revealed no evidence of fracture and no significant degenerative changes.  There was early degenerative arthritis of the right knee but no degenerative arthritis involving the patient's symptomatic left knee."  Tr. 154.  In addition, Dr. Ocken noted that "[b]ack examination revealed tenderness over the lumbosacral spine."  Tr. 155.   Further, Dr. Ocken explained, "[m]y impression is that the patient seems to have a lot of pain with little objective evidence of musculoskeletal disease. It is true that the patient does have early osteoarthritis of the right knee, however, the left knee on x-ray looks quite good. . . The patient does not have occult spina bifida. I am not sure if this can account for all of her lumbosacral pain."  Tr. 155.

In August 1985, Dr. Marc Friedman conducted another consultative examination of Plaintiff.  Tr. 161-163.  Dr. Friedman's examination revealed that Plaintiff's lungs were clear and that her heart was normal.  Tr. 162.  Plaintiff had full range of motion in the cervical spine and that "[m]ovement in all directions can be done fully."  Id. (emphasis in original).  However, Dr. Friedman noted that while Plaintiff's range of motion in the lumbar spine revealed normal flexion, extension, and left lateral flexion, Plaintiff's right lateral flexion was reduced by 5 degrees. Tr. 162.  In addition, Plaintiff's gait was normal and an examination of Plaintiff's knees demonstrated that they were normal except for "mild" swelling.  Id.  Importantly, Dr. Friedman diagnosed osteoarthritis of the lumbosacral spine and knees, of mild to moderate degree. Id.  He

also concluded that Plaintiff had no gross limitation of movement in the lower back or both

knees, despite "mild" evidence of arthritis. Id.

In addition, in August 1985, Plaintiff had x-rays performed on her lumbosacral spine and

her knees. Tr 163. The x-rays of Plaintiff's spine revealed "a spina bifida occulta defect in the

first sacral segment, but there is no further evidence of congenital defects or of intrinsic bone

disease." Id. In addition, the x-rays of Plaintiff's knees showed "[v]ery early degenerative

change . . on the right characterized by osteophyte formation on the lateral aspect of the femoral

condyle and tibial head as well as on the superior patellar articular surface. There is no evidence

of degenerative change involving the left knee." Tr. 163.

Plaintiff was admitted to Warren Hospital for follow-up treatment throughout 1986. Tr.

480-85. Records reflect that Plaintiff continued to gain weight and suffered from edema

secondary to obesity, but otherwise, the findings were generally normal. Id. In September 1987,

Plaintiff weighed 300 pounds. Tr. 485. A January 1988 chest x-ray showed diffuse chronic lung

changes without evidence of an active process. Id. Plaintiff underwent a pulmonary function test

("PFT") in February 1988 and the results were normal. Tr. 488. A December 1988 straight leg-

raising test was negative and deep tendon reflexes were normal. Tr. 490.

Plaintiff was discharged from Warren Hospital in June 1989, after a four - day admission

for pneumonia. Tr. 167-69; see Tr. 170-218. Examinations of Plaintiff throughout 1989

demonstrated no positive musculoskeletal findings. Tr. 367-69. On July 5, 1989, Plaintiff was

advised to return to work. Tr.368. A clinical note, dated December 12, 1989, provided that

Plaintiff suffered from bronchitis. Tr. 367. A subsequent examination revealed a normal chest,

heart, and abdomen. Id. A neurological exam showed that Plaintiff was fully oriented and alert.

Id.  A clinical note, dated December 22, 1989, reveals that Plaintiff had a urinary tract infection

("UTI"). Tr. 367.  At that time, Plaintiff's weight was 321 lbs. Id.  Clinical records from October

1990 and April 1991 show that Plaintiff had a viral syndrome and bronchitis. Tr. 366. Her weight

at this time was 355 lbs. and 339 lbs. respectively.  Id.

     July 1994 clinical notes from Warren Hospital confirm that Plaintiff had an asthma

exacerbation. Tr. 382-84.  The record also demonstrates that Plaintiff had a subsequent asthma

exacerbation in January 1995, which required hospitalization.  Tr. 386-95.   At that time, an

examination showed good range of motion in all Plaintiff's extremities.  Tr. 394.  Plaintiff

continued to see physicians for follow-up of her asthma and sleep apnea throughout 1995. Tr.

441-44, 450-51.  She was admitted to the hospital in November 1995 for observation of her sleep

apnea.  Tr. 403-08; see Tr. 692-93. At that time, Plaintiff was said to have no other major

medical problems. Tr. 404.   She did, however, have migraine headaches in 1995.  Tr. 412-14.

Plaintiff was hospitalized in December 1995 for abdominal pain, and was diagnosed with an

ulcer. Tr. 419-26. Plaintiff continued to receive treatment for various ailments, including leg

edema and sleep apnea throughout 1996. Tr. 431, 436-38, 441, 446.   In addition, Plaintiff

continued to receive medical care at Warren Hospital from 1999 forward.  See, e.g., Tr. 521-48,

551-621, 628-87, 694-706, 707-718.

     D. Plaintiff's Mental Impairments

     Plaintiff was hospitalized in April 1975 for one week due to anxiety neurosis. Tr. 327.

Thereafter, Plaintiff began an outpatient treatment program with a psychologist, Dr. Alan Radzin,

and was again hospitalized on July 16, 1975, for suicidal ideation.  Tr. 328.  Dr. Peter

Baumecker, a psychiatrist, noted that plaintiff was passive – aggressive and manipulative, rather than depressed.  Id.  He diagnosed Plaintiff as having histrionic personality disorder. Id.

In August 1978, Plaintiff was admitted to Hunterdon Medical Center following an overdose of tranquilizers and alcohol.  Tr. 330-32.  Plaintiff was well from a physical standpoint, but her discharge diagnoses included adult situational reaction manifested by an overdose and suicide attempt, hysterical personality disorder, and exogenous obesity. Id.

In September 1997, Plaintiff was administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") to assess her cognitive ability.  The test was administered by Gerald Zimmerman, Ph.D., and Plaintiff achieved a Full Scale IQ of 81, Verbal IQ of 74, and Performance IQ of 89. (Tr. 473).  Dr. Zimmerman opined that the results of the September 1997 WAIS not only represented her present level of functioning, but that this was "likely to have been her [functioning] level throughout her lifelong years."  Tr. 474.

Dr. Zimmerman also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). Tr. 476-77.  He noted that Plaintiff had a "poor" ability to function independently, deal with work stresses, understand, remember and carry out complex job instructions, and maintain personal appearance.  Id.  He added that Plaintiff possessed "fair" to "good" abilities to function in all remaining areas including following work rules, relating to co-workers, dealing with the public, and using judgment.  Id.

On February 5, 2009, at the request of Plaintiff's counsel, Dr. Craig Weiss, Ph.D., conducted another intelligence evaluation on Plaintiff.  Tr. 809-11.  Dr. Weiss administered the WAIS-III.  Id.  These test results showed that Plaintiff maintained a Full Scale IQ of 68, Verbal IQ of 66, and a Performance IQ of 77.  Dr. Weiss attributed the eight-point difference in the

Verbal IQ score to an "expected 2.9 point decrease" and to "the standard error of measurement which is plus or minus five points." Tr. 811.   Thus, Dr. Weiss contended that the 2009 Verbal IQ of 66 was valid and consistent with the earlier testing.   As a result, Dr. Weiss asserted that Plaintiff functioned in the mild mentally retarded range, and that this range was consistent with a "lifelong history of problems with adaptive functioning going back to her teen years and young adulthood." Tr. 811.

      E.    <u>Medical and Vocational Expert Testimony</u>

      Dr. Robert Sklaroff, a medical expert ("Dr. Sklaroff"), testified at the February 10, 2009 administrative hearing. Tr. 820-32, 833-91.   At the hearing, Dr. Sklaroff was asked to look at Listing 9.09 which defines obesity as: "that weight equal to or greater that the values specified in Table 1 for males Table II for females . . . and one of the following: History of pain and limitation of motion in any weight-bearing joint or the lumbosacral spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the effected joint or lumbosacral spine." Listing 9.09A.   Dr. Sklaroff testified that while Plaintiff was obese pursuant to the Listing criteria, there was no evidence that prior to December 31, 1989, Plaintiff met the remaining relevant criteria. Tr. 830-31.   Specifically, Dr. Sklaroff referred to the August 1985 consultative report of Dr. Marc Friedman and testified that there was "no gross limitation of movement in the lower back or in both knees" and that Plaintiff's condition was "favorable." Tr. 834; <u>see</u> Tr. 161-63.   Thus, Dr. Sklaroff stated  that the findings of Dr. Friedman's exam did not reflect the criteria needed to meet or equal the Listing 9.09(A).   Dr. Sklaroff also testified that Plaintiff's obesity did not meet or equal Listing 9.09 (B), (C), (D) or (E). Tr. 828-30.   Additionally, Dr. Sklaroff referenced the report of Dr. Ocken and confirmed that

while Plaintiff did have spina bifida, per an August 15,1985 lumbosacral spine x-ray, this ailment caused no impingement on Plaintiff's nerves and was likely an incidental finding. Tr. 844-45, 849-50; see Tr. 163.  Dr. Sklaroff also testified that Plaintiff was capable of performing light to medium work activity prior to December 31, 1989, with occasional limitations in bending, squatting, kneeling, and stooping. Tr. 862-63, 872.

In addition to Dr. Sklaroff, Carolyn Rutherford, a vocational expert, also testified at the 2009 hearing. Tr. 892-97. At the hearing, the ALJ asked Dr. Rutherford to consider a hypothetical individual of Plaintiff's age, education and work experience who could do a range of light work. Tr. 892-93.  Specifically, the hypothetical individual could occasionally bend, squat, kneel, and stoop, and could perform one to two-step tasks.  Tr. 893. The VE testified that while the hypothetical individual would be unable to perform Plaintiff's past work, the hypothetical individual would be able to perform the exertionally light, unskilled jobs of assembly, packer, and sewing machine operator. Id.; See U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") (4th ed. Rev. 1991) (Job Codes 731.687-034, 920.687-082 and 786.685-030, respectively).

E.      The ALJ's Decision

The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act on December 31, 1989. Tr. 755. The ALJ went on to apply the five-step process in order to determine Plaintiff's disability status as of the alleged onset date. Id.  At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability. Id.  At Step Two, the ALJ determined that Plaintiff had the following severe impairments during the relevant period: obesity, mild osteoarthritis, and low intellectual

10

functioning.  In addition, subsequent to the expiration of her date last insured, Plaintiff had the following severe impairments: asthma, obesity, degenerative joint disease, ulceration of the left lower extremity, and venous insufficiency. Id.

However, at Step Three, the ALJ determined that Plaintiff had no impairment or combination of impairments that would qualify for automatic disability status including the now deleted 9.09 obesity listing[2]. Id.   Specifically, the ALJ found that after reviewing the entire record, Plaintiff did not show any condition which would meet and/or equal the severity requirements under Listing 9.09A because the effects of Plaintiff's obesity were related to exertion rather than any joint impairment or condition. Tr. 756.  Moreover, the ALJ noted that, according to Dr. Sklaroff, Plaintiff's mere complaint of pain, without more, was not sufficient to satisfy the severity requirement of the obesity listing, particularly since the clinical examination only showed some limitation of motion and only mild to moderate degenerative changes of the lumbosacral spine and right knee. Id.  In addition, the ALJ noted that Dr. Sklaroff had indicated that there was no significant impact on gross limitation of movement of the lower back or knees. Id.

With regard to Listing 9.09B, Dr. Sklaroff testified that while there was evidence of hypertension during the relevant period, Plaintiff's hypertension did not cause congestive heart failure or other complications, such as renal disease, that would have affected her ability to

_____

[2] Listing 9.09(A) provides: that weight equal to or greater that the values specified in Table 1 for males Table II for females (100 percent above desired levels) and one of the following: History of pain and limitation of motion in any weight-bearing joint or the lumbosacral spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the effected joint or lumbosacral spine. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 9.09.

function. Id. As a result, Dr. Sklaroff concluded that there was no evidence that Listing 9.09 B was met or resulted in medical equivalency. Id.

Finally, Dr. Sklaroff testified that there was no evidence in the record from prior to Plaintiff's date last insured that would satisfy the severity requirements under Listing 9.09C, 9.09D or 9.09E. Specifically, with regard to Listing 9.09C, an electrocardiogram performed during a consultative evaluation on August 22, 1985, was normal. Tr. 756. Similarly, with respect to Listing 9.09D, Dr. Sklaroff testified that while Plaintiff had a "predisposition" for venous insufficiency, the record contained no evidence of this condition on or before December 31, 1989. Indeed, the record reflects that Plaintiff was treated for this condition in 2001. Finally, with respect to Listing 9.09E, Dr. Sklaroff testified that there was no evidence of a respiratory condition before December 31, 1989. Tr. 756-757. Instead, Dr. Sklaroff noted that the evidence demonstrated that Plaintiff was treated for chronic obstructive pulmonary disease in the mid 1990s and was diagnosed with bronchial asthma in July 1993. As a result, the ALJ found that Plaintiff's conditions did not satisfy the severity requirements of Listing 9.09 at any time before December 31, 1989.

In addition, the ALJ considered whether Plaintiff's borderline intellectual functioning, when combined with her obesity, would meet or equal listing level severity under 12.05 for Mental Retardation. Id. In that regard, the ALJ noted that both the District Court and the Circuit Court had "left undisturbed the ALJ's finding that [Plaintiff's BIF] did not meet or equal listing severity under 12.05." Tr. 757. Specifically, the ALJ explained that the District Court found "that the ALJ had correctly concluded that because Performance, Verbal and Full Scale IQs were not at 70 or below and because claimant had not evinced dependence upon others for self-care,

12

the claimant was not entitled to a presumption of disability under Listing 12.05." Tr. 757.

Moreover, the ALJ noted that, in the past, Plaintiff had been "able to perform fairly complex job

tasks which involve cashiering, keeping records and waiting on customers." Id. As a result, the

ALJ found that Plaintiff could not meet the severity of Listing 12.05.

In addition, the ALJ considered evidence in the record of treatment after the date last

insured.  In that regard, the ALJ found that although Plaintiff was diagnosed with asthma in 1993

and that Plaintiff received emergent care for this condition, the record shows that Plaintiff

obtained "excellent improvement" following treatments with a nebulizer.  Moreover, the record

shows that with treatment, Plaintiff remained asymptomatic only requiring follow-up visits at 6

month intervals.  Thus, the ALJ found that the evidence of asthma did not meet or equal listing

level severity under Listing 3.03.

In addition, with respect to Plaintiff's venous insufficiency, for which she received

treatment in 2001, the ALJ found that Plaintiff had responded positively to treatment and that

subsequent evaluations did not reveal any deep vein thrombophlebitis or greater saphenous vein

thrombosis. Tr. 757-758.  Therefore, the ALJ concluded that this impairment did not satisfy the

severity requirements in Listing 4.11, as there was no evidence that the condition persisted for at

least 3 months after prescribed treatment. Id.

As a result, the ALJ determined at Step Four, that Plaintiff retained the RFC to perform a

range of light work that involved routine, one to two step tasks with no more than occasional

bending, squatting, kneeling and stopping.  In making this finding, the ALJ considered all the

objective medical evidence and other evidence in the record.  In addition, the ALJ explained that

he had considered all Plaintiff's statements about the intensity or limiting effects of pain and, to

the extent that some were not substantiated by objective medical evidence, the ALJ made a finding of credibility based on the entirety of the evidence in the record.  In that regard, the ALJ referred to the above discussion of Plaintiff's musculoskeletal and obesity impairments. In addition, the ALJ noted that Plaintiff's asthma was reasonably controlled through nebulizer treatment.  Moreover, the ALJ noted that to the extent Plaintiff suffered from venous insufficiency, she received IV antibiotic therapy and local wound care and had been fully healed.

In addition, in considering the effect of Plaintiff's cognitive deficiencies on her ability to perform work, the ALJ considered the results of IQ tests administered by both Dr. Zimmerman and Dr. Weiss.  However, the ALJ rejected the results of Dr. Weiss' mental evaluation because the examination was administered in 2009, 20 years after the expiration of the last date insured. Id.  Indeed, the ALJ explained that " the results of [the 2009 test], done 20 years after the expiration of the date last insured, cannot be relied upon to find that claimant's overall condition, prior to the expiration of the date last insured, was equivalent in severity to Listing 12.05C."  Tr. 759.  Further, the ALJ also stated that even assuming the validity of the 2009 test, "any number of reasons could account for a decline in [Plaintiff's] intellectual functioning over the intervening 12 years since the 1997 testing."  Tr. 759.  Moreover, the ALJ noted that Dr. Weiss' report  was primarily written in the present tense, and, therefore, could not demonstrate that Plaintiff's intellectual functioning met or equaled listing-level severity 20 years earlier.   In addition, in light of Plaintiff's past work history, the ALJ rejected Dr. Weiss' conclusion that Plaintiff  "has never been able to function at school or job."

In contrast, the ALJ accepted Dr. Sklaroff's testimony that although claimant had recently received IQ scores below 70, such results do not mean that her IQ scores were at that level 20

14

years before.  Indeed, Dr. Sklaroff testified that while there could be some decrease in IQ scores over time, without qualitative and quantitative markers over a period of time to measure her cognition, it would be difficult to conclude that based on a February 2009 evaluation, Plaintiff's IQ scores were below 70 as far back  as 1989. Id.  Further, the ALJ noted that Plaintiff underwent valid IQ testing in April 1997 which revealed IQ scores above 70 and the ALJ rejected Plaintiff's argument that "because of 'standard error' in measurement and 'expected decrease in scores' the recent IQ scores correctly reflect[ed] claimant's cognitive status 20 years ago." Tr. 760.  In addition, the ALJ relied on Dr. Sklaroff's testimony that Plaintiff's intellectual functioning would not, as a matter of medical significance, affect the obesity related musculoskeletal findings nor impair the Plaintiff's knee and back function.

Finally,  in response to Plaintiff's argument that the threshold under Listing 9.09A is very low with regard to limitation of motion, pain and arthritis in a weight bearing joint, the ALJ relied on Dr. Sklaroff's testimony that Plaintiff's mere complaints of pain were insufficient to equal listing-level severity since she did not require significant treatment and her complaints were addressed with over-the counter medication.  In addition, the ALJ reiterated the following evidence in the record as support for her finding that Plaintiff did not meet the 9.09A Listing: (1) Dr. Friedman's 1985 exam revealed no limitation of motion in Plaintiff's spine other than lateral flexion which was limited to 15 degrees on the right only (normal is 20 degrees); (2) that x-rays showed only very early degenerative changes in the right knee and none in the left prompting Dr. Friedman to opine that there was no gross limitation of movement in the back or knees and that Plaintiff's gait was normal; (3) that Plaintiff did not require treatment for mild osteoarthritis.

15

Next, the ALJ determined at Step Four that Plaintiff was unable to perform any past relevant work since the requirements of those jobs, including cashier and bus driver, exceeded the functional limitations of the claimant's residual functional capacity. Id.  Accordingly, the ALJ found that Plaintiff was unable to return to return to past relevant work as of her date last insured. Id.

Moving to Step Five, the ALJ found that at the time of filing, Plaintiff was a "younger individual" for disability insurance.  The ALJ also found that Plaintiff had an 8th grade education and was able to communicate in English.  Finally, the ALJ considered Plaintiff's age, education, work experience, and residual function capacity, and found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform (20 CFR 404.1569 and 404.1569a). Relying on the testimony of vocational expert, Dr. Rutherford, the ALJ found that given all of the factors listed above, Plaintiff would be able to perform the requirements of representative occupations such as assembly, (DOT listing 731.687-082) of which there are 500,000 jobs nationally and 6,800 jobs regionally; packer (DOT 920.687-082) of which there are 600,000 jobs nationally and 6,600 jobs regionally; and sewing machine operator, (DOT 786.685-030), of which there are 215,000 jobs nationally and 2,400 jobs regionally. Tr. 893.  For these reasons, the ALJ concluded that, Plaintiff  "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy," and therefore, that a finding of "not disabled" was appropriate. Tr. 762.

## V.   Discussion

### A.  Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive if supported by "substantial evidence on the record." 42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings have support by such evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. Jones v. Barnhart, 364 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 108 S. Ct. 2541, 2545, 101 L. Ed. 2d 490 (1988)) A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for that of the fact – finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986). A reviewing court "will not set a Commissioner's decision aside, if it is supported by substantial evidence, even if we would have decided the

factual inquiry differently." Hartranft 181 F.3d 358 at 360 (citing 42 U.S.C. § 405 (g); Monsour Medical Center, 806 F.2d at 1190-91).

### B.  Standard for Entitlement of Benefits

Disability insurance benefits may not be paid under the Act unless the claimant first meets the statutory insured status requirements. See 42 U.S.C. § 423©. Claimant must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. 423 (d)(1)(A); see Plummer, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. 42 U.S.C. § 1382(a)(3)(A); 42 U.S.C.§ 1382c(a)(3)(B).

The Act establishes a five – step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the Plaintiff has shown that she is  not currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a); see Bower v. Yuckert, 482 U.S. 137, 146-147 n. 5 (1987). If a claimant is presently engaged in any form of substantial, he/she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140. Second, the ALJ determines whether Plaintiff has demonstrated a "severe impairment" or "combination of

impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(C); see Bowen, 482 U.S. at 146-7 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." Id. A claimant who does not have a severe impairment is not considered disabled. 20 C.F.R. § 404.1520©; see Plummer, 186F.3d at 428.  Third, if the impairment is found to be severe, the ALJ then determines  whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Sub pt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his/her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his/her burden of proof and is automatically entitled to benefits. See 20 C.F.R. § 404.1520(d); see also Bowen, 482 U.S. at 146-47 n. 5. If the specific impairment is not listed, the ALJ will consider in his/her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. See 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ must consider whether the combination of impairments is equal to any listed impairment. Id. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he/she retains the residual functional capacity to perform his/her past relevant work ("PRW"). 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform her previous work, the

claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. Plummer, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his/her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." Bowen, 482 U.S. R 146-47 n. 5; Plummer, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. Id.

C. **Plaintiff's Arguments on Appeal**

In the instant matter, Plaintiff argues that the ALJ made four separate errors that would require this Court to reverse the decision of the Commissioner or, in the alternative to remand to the Commissioner for reconsideration. First, Plaintiff claims that the ALJ erred at Step Three because she improperly failed to find that Plaintiff's impairments satisfied the requirements of the former listing of impairments for obesity on her date last insured, and that she was disabled per se. In arguing this point, Plaintiff contends that the ALJ erroneously relied on the opinion of Dr. Sklaroff who "did not correctly understand or apply the proper legal standard" regarding the requirements of the 9.09 Listing. Next, Plaintiff contends that the ALJ improperly rejected the opinion of Dr. Weiss, the psychologist who evaluated Plaintiff in 2009 and administered a second IQ test to Plaintiff. Plaintiff then argues that the ALJ failed to address the report of Dr. Zimmerman or the vocational expert's testimony that Plaintiff's limitations would preclude

work.  Finally, Plaintiff claims the ALJ improperly failed to make any finding regarding Plaintiff's credibility.

### 1.  The ALJ Properly Found that Plaintiff's Impairments, Either Singly or In Combiation, Did Not Meet or Equal the Listings

### I. Listing 9.09

Initially, Plaintiff argues that the ALJ erred at Step Three when she decided that Plaintiff did not meet the listed impairment for obesity in Section 9.09A as of her date last insured.  A woman is presumed to be disabled due to obesity when she establishes the following medical listing: "weight equal to or greater than the values specified in . . .Table 11 for females. . .and one of the following: A. History of pain and limitation of motion in any weight bearing joint or spine (on physical examination) associated with X-ray evidence of arthritis in a weight bearing joint or spine."  20 C.F.R. pt 404, subpt. P, app. 1 § 9.09.   Thus, the Court must first consider whether Plaintiff met the weight requirements for obesity, and then determine whether Plaintiff  meets the additional criteria outlined in section 9.09A.

In the instant matter, the Court notes that neither party appears to dispute that Plaintiff met the height and weight requirements for obesity as required by section 9.09A.  Indeed, the record demonstrates that Plaintiff was 63 inches tall and weighed 321 pounds in December 1989. Thus, the Court is satisfied that Plaintiff has clearly met the Table II requirements for obesity.

Next, Plaintiff argues that the record demonstrates that she satisfied the additional criteria of section 9.09A which requires a "history of pain and limitation of motion in any weight-bearing joint or the lumbosacral spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the affected joint or lumbosacral spine."  20 C.F.R.

21

pt. 404, subpt P, app.1 § 9.09A.   In that regard, Plaintiff argues that the ALJ erred in relying on

the testimony of Dr. Sklaroff, and, specifically, that both the ALJ and Dr. Sklaroff erroneously

applied a heightened standard of what was required to meet the requirements of 9.09A.

Initially, the Court notes that "section 9.09A, by its plain language, requires only a history

of pain and limitation of motion, but does not state that a particular level of pain or limitation

must be demonstrated." Ingram v. Chater, 107 F.3d 598, 602 (8th Cir. 1997)(citations omitted).

Indeed, in Ingram, the Eighth Circuit noted that "at least three circuit courts of appeals agree that,

for purposes of § 9.09A, a claimant need only demonstrate a minimal amount of pain and

limitation of motion." Id. (citing Hughes v. Shalala, 23 F.3d 957, 959 (5th Cir.1994) ("There is

no requirement that the pain be severely limiting [or] that the limitation of motion be marked....

The listing requires only limitation of motion...."); Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th

Cir.1991) ("The ALJ ... imposed unjustifiable new requirements to Listing [9.09A] by requiring

Carnes to show that her arthritis is more than minimal, and that her limitation of motion is

'significant.' "); Pitzer v. Sullivan, 908 F.2d 502, 505 (9th Cir. 1990).  "Moreover, the regulation

also says that long-term obesity is usually associated with other disorders, and it is 'the advent of

such disorders [that] is the major cause of impairment.'" Pitzer, 908 F.2d at 505(quotations

omitted); see also Carnes, 936 F.2d at 1215.

Further, the Ingram court explained that " the amount of x-ray evidence of arthritis

necessary for purposes of § 9.09A is identical to that necessary to demonstrate a history of pain

and limitation of motion." Ingram, 107 F.3d at 603.  Thus, for example, in Carnes, the Eleventh

Circuit held that  "an obese claimant need present no more than evidence of minimal

degenerative joint changes to meet the required showing of 'X-ray evidence of arthritis.' "

22

Carnes, 936 F.2d at 1219;  see also Hughes, 23 F.3d at 959 ("The listing [only] requires ... any amount of x-ray evidence of arthritis.");  Johnson v. Bowen, 687 F.Supp. 1284, 1307 (W.D.Wis.1988) ( "[T]he degree of severity of the arthritis necessary to satisfy this section is very low.").  In other words, to require a claimant "to produce X-ray evidence of more advanced arthritis is . . . to ignore the 'profound effect of excessive weight on a weight-bearing joint' which justifies the 'relatively modest pathological threshold' imposed by [§ 9.09A]." Carnes, 936 F.2d at 1219 (quoting Johnson, 687 F.Supp. at 1307).

Finally, the Ingram court explained that a claimant is "not required to show that her symptoms of pain and limitation of motion were caused by arthritis and not just by her obesity." Ingram, 107 F.3d at 603 (quotations and citations omitted).

In the instant matter, the record demonstrates that as early as 1985, Plaintiff complained of pain related to her musculoskeletal ailments.  Indeed, in a 1985 report, Dr. Ocken noted that his "impression is that the patient seems to have a lot of pain with little objective evidence of musculoskeletal disease. It is true that the patient does have early osteoarthritis of the right knee . . . I am not sure if this can account for all of her lumbosacral pain." Tr. 155.  In addition, in his 1985 report, Dr. Friedman noted that Plaintiff had pain in her lower back and knees which she treated with over-the-counter medication.  Tr. 161.  Thus, the Court is satisfied that Plaintiff has demonstrated a history of pain related to her back and knees sufficient to meet the pain requirement of Listing 9.09A.

In addition, the Court notes that at the 2009 hearing, Dr. Sklaroff testified that Dr. Friedman's 1985 orthopedic evaluation of Plaintiff revealed that while Plaintiff's " thoraco-lumbosacral area showed no tenderness and flexion/extension was possible to 90 degrees; lateral

flexion was limited to 15 degrees on the right." Tr. 756 (emphasis added).   Thus, the record

does appear to demonstrate that Plaintiff had a limitation of motion in her spine to meet the

requirements of Listing 9.09.   However, Plaintiff has not identified anything in the record to

demonstrate a limitation of motion in her knees, and, the Court notes that Plaintiff has conceded

that she did not have a limited range of motion in the knee as required by the Listing.   Pl's Br. at

11.   Thus, for purposes of determining whether Plaintiff can be found disabled under Listing

9.09, the Court will only consider Plaintiff's ailments regarding her spine.

Importantly, and in that regard, the Court notes that for Plaintiff to meet the requirements

of the 9.09 Listing , Ms. Christie must demonstrate a history of pain and a limitation of motion in

her spine as well as x-ray evidence of arthritis in her spine.   Here, the Court notes that Plaintiff

has also conceded that she did not have "imaging findings of arthritis in the lumbar spine . . . for

which she did have pain and limited range of motion."   Pl's Br. at 11.   Thus, the Court finds that

Plaintiff cannot meet the 9.09 Listing and, as a result,   that Plaintiff is not entitled to benefits

under the former listing for obesity.

### ii.      Listing 12.05(C)

Next, Plaintiff contends that the ALJ erred when she found that Plaintiff's impaired

mental functioning did not support a finding of disability under Listing 12.05C which requires

"[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental

impairment imposing an additional and significant work-related limitation of function."   Listing

12.05C.   Specifically, Plaintiff argues that the ALJ erroneously rejected the opinion and the IQ

test administered by Dr. Weiss in 2009 which found that Plaintiff had a verbal IQ of 66.   The

Court does not agree.

In the underlying matter, the ALJ found that Plaintiff's diminished mental capacity did not meet the required listing severity.  Specifically, the ALJ rejected Dr. Weiss's evaluation of Plaintiff and relied, instead, on the evaluation of Dr. Zimmerman which determined Plaintiff's IQ to be above the threshold level of 70.  In rejecting Dr. Weiss's evaluation, the ALJ explained that Plaintiff had undergone IQ testing in 1997 which did not establish IQ scores below 74.  Moreover, the ALJ noted that although the 2009 test revealed a Verbal IQ of 66 and a full scale IQ of 68, the results of the 2009 testing "done 20 years after the expiration fo the date last insured, cannot be relied upon to find that claimant's overall condition, prior to the expiration of the date last insured, was equivalent in severity to Listing 12.05C. Even assuming the validity of the results of this 2009 testing, any number of reasons could account for a decline in intellectual functioning over the intervening 12 years since the 1997 testing." Tr. 759.  In that regard, the ALJ relied upon the testimony of Dr. Sklaroff who explained that "although there could be some decrease in IQ scores with the passage of time, without qualitative and quantitative markers over a period of time to measure [Plaintiff's] cognition, it is difficult to conclude that based on a February 2009 evaluation, the claimant's IQ scores were below 70 as long as 1989." Id. Indeed, the ALJ noted that Plaintiff underwent valid IQ testing in 1997 which showed IQ scores above 70 and the ALJ gave no weight to Plaintiff's  argument that because of "'standard error' in measurement and 'expected decrease in scores' the recent IQ scores correctly reflect claimant's cognitive status 20 years ago."  Finally, in considering the additional requirements of the 12.05C Listing, the ALJ relied on Dr. Sklaroff's testimony that Plaintiff's "intellectual functioning, would not, as a matter of medical significance, affect the obesity-related musculoskeletal findings, nor impair the claimant's knee and back mobility or functioning."  For these reasons,

the Court finds that the ALJ's decision to disregard Dr. Weiss's evaluation is supported by the record and, therefore, that Plaintiff cannot meet the 12.05C Listing and is not entitled to benefits under that Listing.

### 2. The Reports of Dr. Zimmerman and the Vocational Expert

Next, Plaintiff argues that the ALJ failed to address the reports of two Vocational Experts and Dr. Zimmerman when determining Plaintiff's ability to work at Step Five. Specifically, Plaintiff contends that the ALJ improperly failed to accept the testimony of the Vocational Expert who testified in 2002 that the limitations assessed by Dr. Zimmerman would "erode the occupational base fairly substantially for unskilled work." Tr. 79-80. In addition, Plaintiff contends that the ALJ failed to account for the testimony of the Vocational Expert at the 2009 hearing who stated that assuming various limitations, Plaintiff would be precluded from "sustaining competitive work." Tr. 895-897.

Initially, the Court notes that despite Plaintiff's arguments concerning the VE's testimony at the 2002 hearing, the Vocational Expert actually testified that Plaintiff was not "precluded from all employment." Tr. 79. Moreover, the court notes that the VE testified that Dr. Zimmerman's assessed limitations eroded the unskilled job abase at the sedentary exertional level; however, in the underlying opinion, the ALJ determined that Plaintiff retained the RFC to perform a range of light work, not sedentary work. Thus, to the extent that the VE's testimony in 2002 referred to a sedentary RFC, such testimony is not relevant.

Moreover, to the extent that Plaintiff argues that the ALJ ignored the testimony of the Vocational Expert at the 2009 hearing who testified that, based on Dr. Zimmerman's report, Plaintiff was precluded from competitive employment, the Court does not agree. Initially, the

26

Court notes that the three hypothetical questions posed by Plaintiff's counsel did not assume the entirety of Dr. Zimmerman's report, but only a portion of his report.   For example, in the third hypothetical posed by Plaintiff's counsel, he asked the VE to assume the same hypothetical individual as Plaintiff and to " assume the Judge would find credible Dr. Zimmerman's limitations on the medical assessment where he indicated that she would have a poor ability to think to work independently and a poor ability to handle work stress." Tr. 895.  In response, the VE testified, "[if there is no ability to deal with any kind of stress including subjective stress then I don't believe a person would be able to sustain any kind of competitive employment." Tr. 896. However, Dr. Zimmerman's report did not indicate that Plaintiff had no ability to deal with stress, just that she possessed a "poor" ability to deal with work stress because she uses an asthma machine and is excessively overweight.  Tr. 476-77.  Moreover, Dr. Zimmerman's report also included a number of other positive findings including that Plaintiff possessed a good ability to follow work rules, relate to co workers, deal with the public and interact with supervisors, as well as a fair ability to use judgment and maintain attention and concentration.  Because Plaintiff's counsel did not include these findings as part of a hypothetical to the ALJ, the ALJ did not have to rely on the VE's testimony that "competitive employment would be precluded." Tr. 895-97.

Finally, to the extent that Plaintiff argues that the ALJ committed clear error by not mentioning Dr. Zimmerman's report and giving no indication of the weight she assigned it, the Court does not agree.  Initially, the Court notes that the ALJ's opinion expressly relied on the opinion of Dr. Zimmerman; for example, the ALJ's opinion analyzes the IQ tests performed by Dr. Zimmerman in 1997.   Tr. 759-760.  Moreover, as mentioned above, Dr. Zimmerman's report

27

found that Plaintiff had good or fair abilities in all but four areas of functioning – (1) ability to deal with work stress; (2) ability to function independently; (3) ability to understand, remember and carry out complex job instructions; and (4) maintain personal appearance.  In that regard, the ALJ determined that the areas in which Dr. Zimmerman opined that Plaintiff had a poor ability to function would not preclude her ability to perform unskilled, routine one or two step tasks.  Tr. 758.  Moreover, based on the Vocational Expert's review of Dr. Zimmerman's report, she opined that despite Plaintiff's limitations, there were still jobs that Plaintiff could perform in the national and regional economies.  As a result of this testimony, the ALJ determined that Plaintiff "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."  Tr. 762.  Thus, it is clear that the ALJ did properly consider the opinions of the Vocational Experts and Dr. Rutherford in finding that Plaintiff was not disabled.

### 3. Plaintiff's Credibility

Finally, Plaintiff argues that the ALJ failed to make any findings regarding Plaintiff's credibility.  Specifically, Plaintiff argues that the ALJ did not cite the regulations contained within SSR 96-7p which require "specific reasons for the finding on credibility" and, moreover, that the ALJ failed to provide sufficiently specific reasons for discounting Plaintiff's credibility. The Court does not agree.

Initially, the Court notes that the ALJ's opinion did, in fact, cite to SSR 96-7 as part of the ALJ's finding that Plaintiff retained the RFC to perform light work.  Tr. 758.  Thus, Plaintiff's contention in that regard is simply incorrect.

Moreover, the Court finds that the ALJ's lengthy and thorough opinion chronicled Plaintiff's medical history in detail and that the ALJ only came to the conclusion that Plaintiff

28

retained the RFC to perform light work after considering all of Plaintiff's symptoms and the extent to which these symptoms were consistent with the objective medical and other evidence. Tr. 758.  In that regard, the Court notes that the record demonstrates that early as 1985, Plaintiff's physicians noted that Plaintiff had "a lot of pain with little objective evidence of musculoskeletal disease." Tr. 155.  Moreover, as discussed above, the remaining evidence concerning Plaintiff's musculoskeletal ailments demonstrate minimal limitations on range of motion and very early arthritis unrelated to the range of motion findings.  Further, in her opinion, the ALJ notes that Dr. Sklaroff testified that despite Plaintiff's subjective complaints of pain, Plaintiff's pain did not require any significant treatment and was, instead, addressed with over-the-counter medication, i.e. Tylenol.  Tr. 761.   Finally, the record demonstrates that Plaintiff's other ailments, i.e., asthma and other obesity-related impairments, were controlled easily and simply; for example, Plaintiff's obtained "excellent improvement" for her asthma following nebulizer treatments.  Tr. 758.  Thus, in light of the entirety of the record, the Court finds that the ALJ's determination regarding Plaintiff's credibility was sufficiently specific and supported by the entirety of the record.

### III. CONCLUSION

For the reasons set forth above, the Court concludes that there is substantial evidence in the record to support the ALJ's determination that Plaintiff was not disabled.  Therefore, the ALJ's decision is affirmed in its entirety.


Dated: August 15, 2011                                         /s/ Freda L. Wolfson_____

                                                              Freda L. Wolfson, U.S.D.J.

29